UNITED STATES DISTRICT COUR
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| VITIPRINTS, LLC., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : Civil Case No.: 1:24-cv-06845 |
| VEGANZ GROUP AG, | : |
| | : |
| Defendant. | : |
| | : |
| | : |

## COMPLAINT

VITIPRINTS LLC ("Vitiprints" or "Plaintiff"), alleges as follows against Defendant VEGANZ GROUP AG ("Veganz" or "Defendant"). The allegations herein are made based on personal knowledge as to Vitiprints with respect to its own actions, and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.     Vitiprints, a New York-based research and development company, is pioneering the commercialization of its patented and proprietary print technology platform. This innovative technology transforms 3D-based beverages, foods, vitamins, biologicals, and water-based products into precise 2D single or multi-layered formats, setting a new standard for sustainability. With its cutting-edge platform, Vitiprints can create 2D printed edible and non-edible products, including drink discs, sublinguals, and functional sheets. These products introduce a new category of cost-effective, environmentally friendly alternatives that eliminate the need for plastic packaging while significantly reducing weight, volume, and production costs. The founders of Vitiprints have a proven track record, having created printed products that have generated over one

billion dollars in retail sales worldwide across a variety of industries and applications. Now, they are driving innovation across key verticals such as alternative and dairy milk production, functional beverages, and printed vitamins. The platform offers a unique approach to consumer products by enhancing food security, enabling humanitarian distribution, and maximizing sustainability in product development on a global scale. Certain aspects of Vitiprints' technology are protected by patents (pending) and other aspects of Vitiprints' technology are trade secrets. Vitiprints brings this action to protect those trade secrets from misappropriation by Veganz, a former licensee of Vitiprints. Vitiprints seeks monetary damages arising from the misappropriation of trade secrets by Veganz, the breach of the December 9, 2022 license agreement entered into between Vitiprints and Veganz (the "License Agreement"), and the breach by Veganz of the covenant of good faith and fair dealing that arose from the License Agreement. Vitiprints also seeks a declaratory judgment that Veganz has materially breached the License Agrement and, therefore, is no longer permitted to manufacture Licensed Products and must immediately cease using Vitiprints' trade secrets.

## THE PARTIES

2.      Plaintiff Vitiprints LLC is a Delaware limited liability company, having its principal place of business at 630 Ninth Avenue, Suite 1411, New York, NY 10036.

3.      Defendant Veganz Group AG is a corporation incorporated under the laws of the German Democratic Republic, having a place of business at Anden Kiefern 7, 14974 Ludwigfelde, Germany.

## JURISDICTION AND VENUE

4.      Pursuant to 18 U.S.C. § 1837, this Court has subject matter jurisdiction over the claims asserted herein under the Defend Trade Secrets Act because, as detailed

below, acts in furtherance of the trade secret misappropriation were committed in the United States.

5.      Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction over all claims because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.  There is diversity of citizenship because Vitiprints is a citizen of Delaware and New York and Veganz is a citizen of Germany.

6.      This Court also has personal jurisdiction over Defendant Veganz because, *inter alia,* Veganz has breached a license agreement negotiated and entered into in New York, as alleged below, and committed, or aided, abetted, contributed to, or participated in, tortious acts causing injury to Vitiprints in New York.

7.      In addition, this Court has personal jurisdiction over Defendant Veganz because, as alleged below, Veganz has availed itself of the privilege of conducting business in New York by instructing Vitiprints to manufacture in New York samples of products to be sold by Veganz under the License Agreement ("Licensed Products") and by paying Vitiprints in New York to have those samples made and shipped to Germany. Veganz availed itself of the privilege of conducting business in New York when it induced Vitiprints to disclose its confidential information to Veganz by offering to subject itself to the exclusive jurisdiction of courts in New York for the resolution of any dispute arising from the disclosure of that confidential information. Finally, Veganz has availed itself of the privilege of conducting business in New York by soliciting investors in New York and by obtaining millions of dollars of financing from an investor based in New York City.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2)

because a substantial part of the events giving rise the claims asserted in this Complaint occurred in this judicial district and because the trade secrets stolen by Veganz originated in and are stored in this judicial district. Furthermore, Veganz is subject to this Court's personal jurisdiction with respect to the claims asserted.

9.    The Court has the authority to hear causes of action seeking a declaratory judgment pursuant to 28 U.S.C.A. §§ 2201(a), 2202.

**FACTUAL ALLEGATIONS**

*Vitiprints' Trade Secrets*

10.    Vitiprints has created a customizable print technology platform that enables ordinary water-based products, like milk, to be reduced to precision printed 2D edible (and non-edible) products. While an ordinary gallon of milk weighs almost nine pounds (exclusive of packaging), requires coated cardboard, plastic, or glass containers, must be refrigerated, and has a limited shelf-life, the Vitiprints 2D printed equivalent weighs less than nine ounces, can be packaged in a paper envelope, requires no refrigeration, and has a shelf life of more than two years. Vitiprints' intellectual property solves problems of distribution and storage that have heretofore presented often insurmountable obstacles to profitable commercial food distribution and to food equity.

11.    Since 2017, Vitiprints has invested millions of dollars developing its unique groundbreaking technology related to water-based food processing and storage. In particular, Vitiprints has developed formulations and methods for creating edible printed products from a variety of dairy and non-dairy liquids. Each formulation addresses numerous variables – ingredients, viscosity, moisture content, the order in which materials are combined – and each formulation must be processed in a specific manner. Products are manufactured using existing printing equipment that Vitiprints has modified

to make suitable for producing edible printed products. The formulations, the methods, and the modifications to the equipment are trade secrets (the "Vitiprints Trade Secrets").

12.     To protect its substantial investments in research and other forms of innovation and to safeguard the results of the creativity and dedication of its employees, Vitiprints maintains the details of its trade secrets as confidential information, sharing those trade secrets only with trusted partners pursuant to non-disclosure agreements and/or confidentiality agreements.

13.     Vitiprints has successfully developed the market for its 2D edible products and has no competitors.

***Veganz Stock Price Tumbles Shortly After its IPO***

14.     Veganz is a German stock corporation. Veganz markets a varied selection of vegan foods, and claims to offer its products in over 22,000 stores "in more than half of the European countries."

15.     Veganz made an initial public offering of equity on the Frankfurt Stock Exchange in November 2021 with an offer price of € 87.00 per share.

16.     One year later, in November 2022, Veganz stock was trading at € 12.50 per share.  Veganz desperately needed something new, something game-changing, to revitalize its prospects and to rescue the value of its equity.

***Veganz Comes to New York to Access Vitiprints' Trade Secrets***

17.     Sometime in late 2022, Jan Bredack, founder and CEO of Veganz, learned about Vitiprints and its revolutionary technology for printed food products.  Bredack realized that Vitiprints Intellectual Property, and in particular the Vitiprints Trade Secrets, could be the game-changer that Veganz desperately needed.

18.     Bredack contacted Vitiprints on November 23, 2022.  Bredack was in

New York and asked Andy Ferber of Vitiprints if they could meet.  Bredack went to Vitiprints' office in New York City and told Ferber that Veganz was interested in becoming the exclusive distributor in Europe for products based on the Vitiprints Trade Secrets (the "Licensed Products"). Bredack's real intent, however, was to obtain for Veganz the know-how and trade secrets that Vitiprints used to make its revolutionary products and to exploit those trade secrets in Europe, with or without Vitiprints.

19.    Before disclosing any details regarding the Vitiprints Trade Secrets to Veganz, Vitiprints insisted on a nondisclosure agreement. Vitiprints prepared a draft of the nondisclosure agreement and provided it to Veganz. Veganz had its New York admitted attorney review the nondisclosure agreement.  In order to induce Vitiprints to reveal its trade secrets to a company based in Germany, Veganz offered to subject itself to the jurisdiction of New York courts should any dispute arise regarding the Vitiprints trade secrets. On the same day that Vitiprints sent a draft NDA to Bredack, Bredack responded: "our Lawyer has checked the NDA very quickly. We would like to change the place of jurisdiction to New York, New York City only. Hope that works for you."

20.    On November 27, 2022, Vitiprints and Veganz executed a Mutual Confidentiality Agreement.  In that agreement, Vitiprints and Veganz stated that they "intend to engage in discussions and negotiations concerning the possible establishment of a business relationship between them" and entered into the Mutual Confidentiality Agreement in order to protect as confidential "trade secrets or confidential or proprietary information" disclosed by either party "for the purposes of enabling the Recipient to evaluate the feasibility of such business relationship and to perform its obligations and exercise its rights under any such business relationship that is agreed to between the

parties."

21.     As suggested by Veganz, the Mutual Confidentiality Agreement also provided that Veganz and Vitiprints "consent to personal jurisdiction in the federal and state courts in the City of New York."

22.     Before leaving New York City, Bredack signed the Mutual Confidentiality Agreement in order to get access to Vitiprints' trade secrets as soon as possible.

23.     To convince Vitiprints that Veganz was the right partner to manufacture, promote, and sell in Europe Licensed Products based on the Vitiprints Trade Secrets, during his initial visit to Vitiprints in New York, Bredack told Ferber, the upper management of Vitiprints, and potential investors that Veganz had $20 million in cash on hand to manufacture, promote and market in Europe products to be licensed from Vitiprints. In fact, Bredack later admitted that the "$20 million dollars" that Veganz claimed to have on hand was cash that Veganz hoped to raise after signing the license agreement with Vitiprints.

24.     Bredack and the upper management of Vitiprints negotiated the basic parameters of the License Agreement in face-to-face meetings in New York.

25.     On December 9, 2022, Vitiprints and Veganz entered into a License Agreement to commercialize "Vitiprints Intellectual Property."

26.     Pursuant to the License Agreement, Vitiprints granted Veganz "an exclusive license . . . throughout the Territory, to the Vitiprints Intellectual Property to develop, manufacture, make, have made, import, export, offer for sale, use, sell, have sold, market, promote, distribute and commercialize (including, to the extent separately approved by Vitiprints, by way of sub-licensing) in any way Licensed Products."

27.     The License Agreement defined "Vitiprints Intellectual Property" as, *inter alia*, "the Vitiprints Know-How; and any of the items referenced in the foregoing clauses as related to any Improvements."  Vitiprints Know-How means "all know-how, trade secrets, information, data, concepts, formulas, methods, procedures, designs, compositions, plans, applications, specifications, techniques, processes, technical data, samples, materials, inventions, or discoveries, owned or controlled by Vitiprints, and either (a) related to printable alternate milk and dairy products in various forms, which may include printable flavors and edible graphics and other compositions; (b) related to the Vitiprints Patent or Improvements; or (c) reasonably useful in order to research, develop, make, use, sell or seek approval to market any Licensed Product." And Licensed Products means "any printed alternate milk (including but not limited to Oat, Almond, Soy, Cashew) and dairy product, as well as any method of producing such products, which utilizes or incorporates the Vitiprints Intellectual Property."

28.     The License Agreement defined the Territory as "continental Europe with the countries listed in Schedule A."  Schedule A listed the following countries: UK, Ireland, Norway, Sweden, Finland, Denmark, Poland, Czech Republic, Italy, Iceland, Greece, France, Switzerland, Belgium, Netherlands, Spain, Portugal, Cypress, Slovenia, Slovakia, Austria, and Germany.

29.     The License Agreement also provides that the Vitiprints Intellectual Property is confidential.  Veganz can use the Vitiprints Intellectual Property, including the Vitiprints' Trade Secrets, only as permitted by the License Agreement.

30.     The License Agreement provides that Veganz' confidentiality obligations concerning the Vitiprints Intellectual Property, including the Vitiprints Trade Secrets,

survive the termination of the License Agreement.

31.    The License Agreement also provides: "During the Term of this Agreement and for so long as Veganz or its Affiliates retains a license pursuant to terms of this Agreement Veganz shall not participate in the distribution, marketing, sale, or disposition of Licensed Products with any entity other than Vitiprints (or its Affiliates), except for sales of Licensed Products in accordance with the terms of this Agreement."

32.    The License Agreement provides that it "shall be governed by and construed in accordance with the laws of the State of New York."

33.    Pursuant to the License Agreement, and in order to obtain access to Vitiprints' trade secrets, Veganz wired the initial upfront payment to a Vitiprints' bank account in New York City.

34.    To induce Vitiprints to develop new products and formulations using its trade secrets at its facilities in New York, the License Agreement also provided that Veganz would reimburse Vitiprints for all costs incurred by Vitiprints for development of Licensed Products. Veganz knew that all of the Licensed Products to be developed by Vitiprints would be developed in New York.

35.    On December 15, 2022, Bredack sent to Vitiprints a "wish list" of products that Veganz wanted Vitiprints to develop in New York, using the Vitiprints Trade Secrets, for Veganz to market in the Territory.

36.    Within a week, Vitiprints and Veganz personnel began to conduct virtual product development discussions, identifying products to be developed by Vitiprints in New York using the Vitiprints Intellectual Property, including Vitiprints' Trade Secrets, for Veganz to sell in the Territory.

37.     In order to facilitate the transfer of Vitiprints Know-How, including Vitiprints Trade Secrets, to Veganz, Veganz sent a team of individuals to New York to meet with Vitiprints personnel.

38.     Between January 23 and January 26, 2023, individuals representing Vitiprints and Veganz met in person in New York so that Vitiprints could disclose Vitiprints Know-How, including Vitiprints Trade Secrets, to Veganz.

39.     After the face-to-face meetings in New York, Veganz and Vitiprints conducted weekly conference calls between Veganz personnel in Germany and Vitiprints personnel in New York.  The purpose of those calls, as summarized in meeting notes shared between Vitiprints and Veganz, was "technology transfer."

40.     The Vitiprints Trade Secrets, which were disclosed to Veganz as part of the technology transfer, included formulations of Licensed Products, techniques for optimizing the production of Licensed Products at scale, and methods for dehydrating substances to achieve desired results.

41.     Between January 2023 and July 2024, Veganz personnel sent hundreds of emails to Vitiprints personnel in New York requesting detailed information regarding the Vitiprints Know-How, including the Vitiprints Trade Secrets.

42.     At the request of Veganz, Vitiprints produced samples of the Licensed Products in New York and shipped those samples to Veganz for distribution to potential customers in the Territory.

43.     In May 2023, Veganz began requesting "recipes" for the Licensed Products from Vitiprints personnel in New York.  Veganz knew that the "recipes" were Vitiprints Trade Secrets and were developed by Vitiprints in New York.

44.    By July 7, 2023, using Vitiprints Know-How, including the Vitiprints Trade Secrets obtained from Vitiprints' employees in New York, Veganz was able to produce Oat Mililk, one of the Licensed Products, in Germany.  Vitiprints continued to develop other Licensed Products in New York as requested by Veganz.

***Veganz and Vitiprints Form a Joint Venture in New York***

45.    In July 2023, John Breback, the CEO and founder of Veganz, convinced Andrew Ferber and John Gentile, two of the partners of Vitiprints, to form a joint venture, called Vegreat LLC, a Delaware limited liability company, with a business address in New York City, "to create printable vegan-based products, set-up production and sales opportunities for the sale of printed vegan products and sales opportunities for non-printed existing and future Vegan products in territories to be mutually determined."

46.    The "Joint Venture Agreement relating to Vegreat LLC" defined the "primary purpose" of the joint venture as:

> • Licensing of Vitiprints LLC's technology to producers of vegan products in Vegan Markets for the creation of new products, in particular, in the ramp-up phase, via attracting companies through the "Mililk" product (alternative milk) proof of concept by Veganz Group AG under the Veganz Contract;
>
> • Working with companies to customize the application of Vitiprints LLC's technology to their product for Vegan Markets.

47.    Although the parties to the Joint Venture Agreement Relating to Vegreat LLC were Better Earth Ventures LLC, owned by a group led by Ferber, and The Eastern Gentlemen Group LLC, controlled by Bredack and New York-admitted attorney Markus Kaeplinger, Bredack frequently referred to Vegreat as a joint venture between Veganz

and Vitiprints.

48.    The Joint Venture Agreement provided that the parties "consent to jurisdiction under the state and federal courts within the state of New York."

49.    In connection with the Joint Venture Agreement, Bredack's lawyer prepared an Escrow Agreement pursuant to which Vegreat was to acquire shares in Veganz and hold those shares in escrow for Ferber.  The Escrow Agreement, executed by Ferber, Bredack, and Bredack's New York admitted lawyer, provided "The Parties consent to jurisdiction under the state and federal courts within the state of New York. The Parties agree that this choice of law, venue, and jurisdiction provision is not permissive, but rather mandatory in nature."

***Veganz Makes False Claims to Own the Vitiprints Intellectual Property***

50.    Shortly after entering into the Joint Venture Agreement, Bredack began to falsely represent to the public, including customers and potential customers of the Licensed Products, that Veganz "owned" the Vitiprints Intellectual Property.

51.    On October 5, 2023, in a broadcast of the German television show "Galileo," Bredack falsely stated that he "worked with his team for three years on Mililk." In fact, Bredack did not meet with Vitiprints until November 2022, at which time Bredack and Veganz had no experience at all with 2D printing of edible food products.

52.    On May 9, 2024, FoodNavigator, a widely-read on-line trade magazine providing "news and analysis on food and beverage development and technology," reported, based on false information provided by Bredack in an interview with FoodNavigator, that Veganz "purchased the patents [for 2D-printed plant-based milk] from a New York-based company in 2022" and that the Vitiprints Intellectual Property was "developed back in 2019…by Starbucks and McDonald's….".

53.     After each of the false representations described above, Vitiprints alerted Veganz that the representation was false and demanded that Veganz correct the false representations. Veganz never corrected the false representations.

***Veganz Fails to Take Reasonable Efforts to Exploit the Exclusive License in the Territory***

54.     The exclusive Territory granted to Veganz under the License Agreement encompassed twenty-two countries in Europe.  More than a year and a half after entering into the License Agreement, however, Veganz had offered the Licensed Products for sale in only three of the twenty-two countries included in the Territory: Germany, Austria, and Switzerland.  The Veganz website – from which buyers purportedly could purchase the Licensed Products online – did not accept orders from nineteen of the twenty-two countries in the Territory.

55.     The License Agreement also provided that Veganz could offer sublicenses to other parties in the Territory.   More than a year and a half after entering into the License Agreement, however, Veganz had not entered into any sublicense agreements for any of the other nineteen countries in the Territory.

56.     On November 9, 2023, Vitiprints proposed to arrange sublicenses for Veganz in the nineteen countries that Veganz had so far ignored. Veganz refused the proposal.

57.     As of the date of this complaint, Veganz continues to ignore nineteen of the twenty-two countries included in the Territory and has not entered into any sublicenses.

***Veganz Creates a Website to Offer the Licensed Products for Sale Outside of the Territory***

58.     Instead of attempting to market or sublicense the Licensed Products in the

nineteen countries in the Territory that it had so far ignored, on November 11, 2023, Bredack told Vitiprints that it would begin delivering Licensed Products to Africa "in the next couple of days."

59.     No part of Africa falls within the Territory in which Veganz was licensed to offer and sell the Licensed Products. Bredack knew that by offering Licensed Products for sale in Africa, Veganz was in violation of the License Agreement. As Bredack explained to Vitiprints: "To do this legally we need your commitment and approval to create business there under the Veganz license agreement with Vitiprints."

60.     The Chairman of Vitiprints responded to Bredack later that day: "You already know the answer it's NO. What you are doing is in clear violation of our Licensing Agreement. In spite of what you would like the world to think this is Vitiprints technology and well documented as is our agreement. Veganz holds a License for 22 countries in Europe only. Not the world. You can only legally ship the Licensed product to countries within the granted territory."

61.     On November 16, 2023, counsel for Vitiprints sent a letter to Bredack emphasizing the territorial limits of the License Agreement: "…as you know, the License Agreement grants to Veganz the right to develop, market and sell the Vitiprints Intellectual Property in the specific countries listed in Schedule A to the License Agreement, comprising most of Europe. . . .Veganz is not authorized to develop, market and sell products in Africa or in any other country not listed on Schedule A and Veganz should not be making any efforts to do so."

62.     Veganz did not respond. Instead, Veganz doubled down on its violative conduct.

63.     Two days after Vitiprints instructed Veganz that it could not ship Licensed Products to Africa, Veganz caused to be published a website at the URL www.mililk.africa, specifically for the purpose of promoting the Licensed Products in Africa. The www.mililk.africa website included graphics identical to those found on Veganz' own homepage. The www.mililk.africa website included an "order now" button for "Organic Veganz Mililk Oats Barista 5L," a Licensed Product, and links to "Mililk Starter Pack New Year 2024 Special," which includes Licensed Products, and "Mililk Oat Barista (10 liters)," also a Licensed Product. The www.mililk.africa website included links directing visitors to the Veganz homepage.

64.     Vitiprints learned of the www.milik.africa website in June 2024 and demanded that Veganz take down the website.  Although Veganz claimed that it had nothing do with the website, the website was taken down within five days of Vitiprints demanding that Veganz take it down.

65.     Veganz claimed to know the identity of the person or persons who published www.mililk.africa website, allegedly without the approval of Veganz, but refused to provide any information to Vitiprints regarding that person or those persons.

***Veganz Offers the Licensed Products for Sale at a Tradeshow in Africa***

66.     When it discovered Veganz' www.mililk.africa website, Vitiprints also learned that less than four months after Vitiprints expressly told Veganz that Veganz was not authorized to promote Licensed Products in Africa and should not attempt to do so, Veganz had sent a team, including its head of sales responsible for all major and international customers, to South Africa to promote Licensed Products at Hostex, the premier gathering of food products manufacturers, distributors and buyers in sub-Saharan Africa.  The 2024 edition of the annual Hostex tradeshow took place in Johannesburg,

South Africa, on March 3, 4 and 5. Veganz is included in the Hostex 2024 exhibitor list (https://www.hostex.co.za/exhibitors/ and https://www.hostex.co.za/exhibitor/veganz-mililk/). Videos on YouTube document Veganz' participation in Hostex 2024 in South Africa:

https://www.youtube.com/watch?v=v9qRBEZClUI

https://www.youtube.com/watch?v=_dTzk1GK3OM

Veganza rented a booth in the Hostex Exhibition Hall; Veganz promoted Licensed Products to potential buyers and distributors; and Veganz took numerous orders for Licensed Products while at Hostex 2024.

67.     Veganz' participation in Hostex 2024 was a clear violation of the License Agreement.  For that reason, when Vitiprints confronted Veganz about its participation in Hostex 2024, Veganz directed its attorney to advise counsel for Vitiprints that "Veganz Group AG has never sold nor promoted nor commercialized any of the Licensed Products outside of the Territory and will also not do so."

68.     In fact, at the time that Veganz unilaterally decided to market Licensed Products outside of the Territory, Vitiprints was actively engaged in negotiating an exclusive license for distribution in Africa with another party. Veganz was aware of these negotiations and, nonetheless, acted in violation of its contractual obligations and endangered Vitiprints prospective commercial opportunities.

***Veganz Fails to Make Royalty Payments or Provide Royalty Reports***

69.     The License Agreement obligates Veganz to make monthly royalty payments based on net revenue from the sale of Licensed Products in the Territory by Veganz (and its sub-licensees, of which there are none), beginning on the first anniversary of the "First Sale Date," defined as the date of the first commercial sale of a

Licensed Product.

70.    According to information provided by Veganz, the First Sale Date was in July 2023, to Red Bull Soccer Club.

71.    Veganz has not made any royalty payments to Vitiprints.

72.    The License Agreement obligates Veganz to provide Vitiprints with monthly "written reports summarizing sales of Licensed Products" with each royalty payment.

73.    Veganz has failed to provide to Vitiprints any written reports summarizing sales of the Licensed Products.

74.    According to a press release issued by Veganz, as of April 2024, just one of the many retailers Veganz claims to do business with has made Licensed Products available in over 5700 retail outlets in Germany . Nonetheless, Veganz paid no royalties to Vitiprints for the second quarter of 2024 (ending June 30, 2024) and never provided a written report.

***Vitiprints Terminates the License Agreement Effective August 2, 2024***

75.    On June 19, 2024, counsel for Vitiprints gave Veganz notice of material breach of the License Agreement based on the fact that Veganz offered the Licensed Products for sale in Africa.

76.    Counsel for Veganz responded on June 20, 2024, and requested a notice of proposed termination as provided in Section 3.1 of the License Agreement.

77.    On June 24, 2024, counsel for Vitiprints gave notice of proposed termination to Veganz, pursuant to Section 3.1 of the License Agreement, based on 1) the sale, promotion and commercialization of the Licensed Products outside of the Territory; 2) breach of the covenant of good faith and fair dealing by repeatedly making false

statements to Vitiprints regarding the promotion and sale of the Licensed Products outside of the Territory; 3) failure to exercise reasonable efforts to sell, promote, and commercialize the Licensed Products in the Territory; and 4) making false statements to potential customers and investors regarding the ownership of Vitiprints Intellectual Property.

78.    The June 24, 2024, notice of proposed termination was hand-delivered to Veganz on July 3, 2024.  Veganz made no attempt to cure any of the breaches identified in the notice of proposed termination.  Consequently, termination of the License Agreement became effective 30 days later, on August 2, 2024.

***Veganz Steals the Vitiprints Trade Secrets***

79.    The License Agreement provides that after termination, Veganz "shall have the right to continue to promote and sell any and all Licensed Products that have been manufactured prior to the effective date of such termination in the Territory for the earlier of a period of six (6) months or until the exhaustion of Veganz's inventory of Licensed Products."

80.    Upon termination of the License Agreement, Veganz has no right to manufacture Licensed Products or to use the Vitiprints Intellectual Property, including the Vitiprints Trade Secrets, in any way.

81.    The notice of proposed termination demanded that Veganz immediately cease manufacture of any Licensed Products and provide to Vitiprints a current and accurate inventory of all Licensed Products in the possession or control of Veganz. Veganz refused to provide an inventory of Licensed Products on hand.

82.    Having obtained access to the Vitiprints Trade Secrets, Veganz has ignored the fact that the License Agreement has terminated and is now expanding its

production capacity in order to use the Vitiprints Trade Secrets to manufacture Licensed Products in Germany without paying for the use of Vitiprints Intellectual Property.

83.    On August 5, 2024, Veganz issued a press release stating that it has obtained a commitment of €10 million from Global Corporate Finance LLC, a New York based private equity group, to enable Veganz to continue and increase the manufacture of Licensed Products using the trade secrets that Veganz stole from Vitiprints.

84.    On September 5, 2024, Veganz issued a press release stating that it had developed a "more efficient" way to make Licensed Products and was continuing to manufacture the Licensed Products, i.e., "the popular organic Veganz Mililk products." Veganz claimed to have developed the "more efficient" process for making Licensed Products by "joining forces" with the Döhler Group, a global producer, marketer and provider of technology-based natural ingredients and ingredient systems.

85.    Veganz has revealed the stolen Vitiprints Trade Secrets to the Döhler Group.

### FIRST CLAIM FOR RELIEF

**(Misappropriation of Trade Secrets:
Defend Trade Secrets Act)**

86.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 85 herein.

87.    The Vitiprints Trade Secrets, as described above, derive independent economic value from not being generally known or readily ascertainable. The Vitiprints Trade Secrets are the result of the investment of thousands of hours of time and millions of dollars. Veganz could not develop comparable intellectual property, if at all, without a comparable investment of time and money. The fact that the Vitiprints Trade Secrets are not generally known or readily ascertainable is demonstrated by the fact that Vitiprints

has no competitors in the field of 2D printable edible products.

88.      Vitiprints takes reasonable measures to maintain the secrecy of the Vitiprints Trade Secrets including the following measures:

- Designating critical confidential information as "confidential;"

- Implementing a policy regarding the handling/shredding of waste documents;

- Requiring non-disclosure agreements with both employees and other businesses, including suppliers and manufacturers;

- Requiring employees to enter non-competition agreements where appropriate;

- Securing access to its locations where confidential information is kept;

- Requiring employees to wear access badges;

- Requiring visitors to sign-in and removing unknown persons from the premises;

- Denying visitor/public access to areas where confidential information is kept;

- Keeping confidential information in locked files;

- Limiting access to confidential information stored on computers by using passwords and changing passwords periodically;

- Training employees who travel with confidential information on how to handle the information to prevent inadvertent disclosure;

- Disclosing confidential information to employees only on a need-to-know basis;

- Notifying employees when they receive confidential information and discussing expectations with regard to maintaining its secret nature;

- Implementing a publication screening and approval process; and

- Training supervisors and managers to monitor compliance with the above measures.

89.     The Vitiprints Trade Secrets, as described above, constitute trade secrets within the meaning of 18 U.S.C. §1839(3).

90.     Veganz's retention of the Vitiprints Trade Secrets, Veganz's use of the the Vitiprints Trade Secrets to continue to manufacture and sell Licensed Products, and Veganz's intent to continue to manufacture and sell Licensed Products all violate the License Agreement. Veganz is misappropriating the Vitiprints Trade Secrets. Vitiprints has informed Veganz in writing that it does not have the right to use the Vitiprints Trade Secrets to produce Licensed Products after the termination of the License Agreement. Despite Vitiprints's warning, Veganz has persisted in its misconduct. Veganz's misappropriation of the Vitiprints Trade Secrets is willful and malicious. As a direct and proximate result of Veganz's misappropriation, Vitiprints has been damaged in in an amount to be determined at trial and clearly in excess of $75,000.

### **SECOND CLAIM FOR RELIEF**
#### **(Misappropriation of Trade Secrets:**
#### **New York Law)**

91.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 90 herein.

92.     Vitiprints' formulations and methods for creating edible printed products from a variety of dairy and non-dairy liquids, and Vitiprints' modifications to existing

printing equipment to make that equipment suitable for producing edible printed products, constitute trade secrets under New York law, as they: a) are not generally known or readily ascertainable; b) provide economic value to Vitiprints by virtue of their secrecy; and c) are the subject of reasonable efforts to maintain their secrecy.

93.    Veganz misappropriated the Vitiprints Trade Secrets by using them without Vitiprints' consent and in breach of the License Agreement and by disclosing them without Vitiprints' consent and in breach of the License Agreement.

94.    Veganz' misappropriation of the Vitiprints Trade Secrets was and is willful and malicious.

95.    As a direct and proximate result of Veganz' misappropriation, Vitiprints has suffered and will continue to suffer irreparable harm and monetary damages in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
**(Declaratory Judgment)**

96.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 95 herein.

97.    Vitiprints has fulfilled all of its obligations under the License Agreement and, therefore, is not in breach of any contract or agreement with Veganz.

98.    Veganz has materially breached the License Agreement.

99.    The License Agreement was duly terminated on August 2, 2024.

100.    The dispute between the Vitiprints and Veganz is a justiciable controversy appropriate for declaratory judgment under the Declaratory Judgment Act, 28 U.S.C.A. §§ 2201, 2202.

101.    Vitiprints is entitled to a judicial determination and declaration that

Veganz is in breach of the License Agreement; that the License Agreement was terminated as of August 2, 2024; that Veganz's right to manufacture Licensed Products ceased as of August 2, 2024; that Vitiprints may grant the right to manufacture, promote and sell the Licensed Products in the Territory to a new licensee; and that Veganz's right to sell or promote extant Licensed Products already in inventory terminates on February 2, 2025.

### FOURTH CLAIM FOR RELIEF
**(Breach of Contract)**

102.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 101 herein.

103.    The License Agreement is a valid and binding agreement between Vitiprints and Veganz.

104.    Vitiprints fully performed its obligations under the License Agreement and, therefore, is not in breach of any contract or agreement with Veganz.

105.    Veganz has failed to perform its obligations under the License Agreement by failing to pay royalties, by failing to provide written reports, by promoting and selling Licensed Products outside of the Territory, by failing to exercise reasonable diligence to exploit the exclusive license granted to it, and by participating in the distribution, marketing, sale, or disposition of Licensed Products with an entity other than Vitiprints.

106.     By reason of the foregoing, Veganz has breached its contractual obligations under the License Agreement.

107.    As a direct and proximate result of the breach of the License Agreement by Veganz, Vitiprints has been damaged in an amount to be determined at trial.

### FIFTH CLAIM FOR RELIEF

**(Breach of Covenant of Good Faith and
Fair Dealing)**

108.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 107 herein.

109.    Implied in all contracts, including the License Agreement, is a covenant of good faith and fair dealing which obligates the parties to act in good faith, to use their best efforts to deal fairly with one another, and to do nothing that will impede the other party from obtaining the benefits of the contract.

110.    By such wrongful conduct as is set forth above, Veganz has breached the covenant of good faith and fair dealing and has wrongfully deprived, impaired, destroyed and injured the rights of Vitiprints to receive the value, benefit and fruits of the License Agreement by a) misrepresenting to the market that Veganz developed the Vitiprints Intellectual Property, b) refusing to provide Vitiprints with information essential to protecting the intellectual property that is the subject of the License Agreement, and c) misrepresenting to Vitiprints the details of Veganz' participation in Hostex 2024.

111.    As a result of the breach by Veganz of the covenant of good faith and fair dealing, Vitiprints has sustained substantial damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiff demands judgment against Defendant be entered, as follows:

112.    Granting declaratory judgment that Veganz is in breach of the License Agreement; and

113.    Granting declaratory judgment that the License Agreement has been terminated as of August 2, 2024; and

114.     Awarding Vitiprints compensatory damages for the acts complained of herein in an amount to be determined at trial; and

115.     Awarding to Vitiprints its full costs, disbursements, and reasonable attorneys' fees incurred in this action; and

116.     Awarding to Vitiprints such additional and further relief as the Court deems just and proper.

Dated: New York, New York
        September 10, 2024

                                      /s/     Stephanie Lamerce
                                      Stephanie Lamerce
                                      DUANE MORRIS LLP
                                      230 Park Avenue
                                      New York, New York  10169
                                      Phone: (212) 404 8756
                                      Fax: (212) 202 5077
                                      SLamerce@duanemorris.com.com

                                      Attorneys for Plaintiff
                                      Vitiprints LLC